UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JUAN PEREZ BUITRAGO, "JC PEREZ,"<br><br>Defendant | CRIMINAL No. 20-cr-10097-GAO |

SENTENCING MEMORANDUM

The Government submits its sentencing memorandum in support of its recommendation that the Court sentence the defendant, Juan Perez Buitrago ("Perez"), to a term of incarceration of 180 months, 3 years of supervised release, a fine of $350,000, and a $200 special assessment, order restitution in the amount of $35,590,245, and grant the government's motion for an order of forfeiture. This recommendation is commensurate with the scale of Perez's DME scheme and the injury the defendant caused to Medicare programs and beneficiaries. The sentence is also necessary for specific deterrence—Perez shows no remorse and resists accountability for his crimes. After he signed a plea agreement, Perez secretly set up new DME companies under his wife's name and bought more than 30,000 patient referrals. Perez now argues that Medicare Advantage is not a Medicare program and is not subject to Medicare regulations. Ex. A, Perez Objections to the Pre-Sentence Report.[1] Not only is this argument baseless, as discussed in Section II.A.1, it also defies Perez's guilty plea.

---

[1] For completeness, the government's response to Perez's Objections to the Pre-Sentence Report are attached as Ex. B.

I.     **FACTUAL BACKGROUND**

    A.     **Perez Orchestrated a Seven-Year, $109 Million Medicare Fraud Scheme.**

Perez submitted more than $109 million in fraudulent Medicare Advantage claims for durable medical equipment ("DME") and received more than $35.5 million in payments from those plans from 2013 through 2020. Perez's crimes affected more than 35,000 beneficiaries—on average, each beneficiaries' medical insurance paid more than $1,100 to Perez's fraudulent companies. *See* Ex. C, HHS Division of Data Analytics Claims Analysis. Meanwhile, beneficiaries and caretakers interviewed in this investigation denied requesting, needing, or being prescribed the DME for which Perez billed. *See* Ex. D, Interviews with Beneficiaries.

Perez perpetrated this scheme over seven years, using over two dozen DME companies and with help from employees and associates—five of whom have been charged in related cases. *United States v. Nathan LaParl, Talia Alexandre, and Stefanie Hirsch*, Case No. 20-cr-10223; *United States v. Jessica Jones* and *Elizabeth Putulin*, Case No. 20-cr-10212.

Perez followed the same general process for each of the 132,000 DME claims that he submitted. Perez and his employees created shell companies with P.O. Boxes set up in various states. Perez bought patient referrals—also called patient "leads"—from foreign and domestic call centers. The call centers used scripts provided by Perez and his associates and asked Medicare beneficiaries if they were interested in receiving a brace at "little to no cost." The call centers provided Perez the patient's demographic, medical, and insurance information. Next, Perez and his employees verified the purchased patient information using a healthcare clearinghouse that they improperly accessed using a Medicare-enrolled company's credentials. Perez submitted claims to Medicare Advantage sponsors, often reusing patient data and fabricating the dates of service. Finally, Perez and his employees received insurance payments

2

by check and then purchased DME for about 60% of the paid claims. The DME that Perez purchased cost an average of $68, while Perez typically billed insurance companies $999 for each piece of DME.

> **B.    Perez Attempted to Continue His DME Scheme After He Executed His Plea Agreement**

After Perez's arrest in December 2019, he claimed to cooperate with the government by providing information against other DME targets, but did not tell the government that he was simultaneously setting up a new DME company under his wife's name. Perez participated in a proffer session on February 10, 2020, purporting to provide information about several DME targets; Perez signed a plea agreement May 21, 2020. In June 2020, the government learned that Perez's wife, Kathleen Perez, had set up three new DME companies, FP Medical Corp., Mothers Love Medical Supply Corp., and Nurturing Mothers Supply Corp. Nurturing Mothers Supply Corp. was a Medicare-enrolled provider that could submit DME claims for Medicare Part B beneficiaries while Mothers Love Medical Supply Corp. was awaiting Medicare-enrollment. Ex. E, Perez Medicare Applications. The companies used the same call center, employee, and office space as Perez's companies. Ex. F, Interview with Gianna Rowe.

In a voluntary interview on June 26, 2020, Perez claimed that he was not involved in creating Kathleen Perez's DME companies and only learned about the companies around May 1, 2021. Ex. G, Perez Interview Report dated June 26, 2020. Perez told federal agents that shortly after his arrest in December 2020, he gave his wife the contact information for compliance officer Mabel Gonzalez but Perez never contacted Gonzalez with respect to Kathleen Perez's companies. *Id.* Perez also denied knowing where Kathleen Perez was buying leads. *Id.* Instead, Perez suggested that Kathleen may have learned how Perez ran his companies from an old employee, Gianna Rowe. Each of these statements was false.

3

In reality, Perez (not Kathleen) contacted Mabel Gonzalez who later submitted the Medicare enrollment applications for Kathleen's companies. Perez first contacted Mabel Gonzalez on or around March 6, 2020 to ask about incorporating DME companies, including a Medicare-enrolled company. Ex. H, Emails between J. Perez and M. Gonzalez. After learning about the expedited Medicare accreditation procedures because of the COVID-19 pandemic, Perez wrote to Gonzalez, "I have not been aware of that!!! Wow ok let me get on this." *Id.* A few days later, Perez sent Gonzalez the Tax ID for Nurturing Mothers, which is needed for the Medicare-enrollment application.

Perez prepared Kathleen Perez to perpetrate the same fraudulent DME by buying patent referrals—or patient "leads"—to manufacture insurance claims. Perez helped Kathleen Perez buy patient referrals, including buying 30,000 "Fresh DME Part B Leads" from Safe Haven Data and Leads on May 27, 2020, less than a week after Perez signed his plea agreement. Ex. I, Emails between Perez and Safe Haven. (Using these patient referrals to submit Medicare claims violates the Anti-Kickback statute. 42 U.S.C. § 1320a-7b.)

Perez's cell phone contained detailed notes on how to run Kathleen Perez's DME companies. Ex. J, Perez's Cell Phone Extraction Report. Soon after Nurturing Mothers Medicare-enrollment application was approved, Perez shared a note saying "Get all call centers back up… With Gianna [Rowe]." *Id.* Perez also shared a note, which appears to be a to-do list for Gianna Rowe, Kathleen Perez's employee, detailing how to set up the new DME companies. (See below note created on May 3, 2020.) Perez also shared a note that appears to contain talking points for Kathleen about what to tell the government, such as "I wasn't paying for leads paying hourly for agents to verified [sic] opted in data." (See below note created on June 16, 2020.)

| | |
|---|---|
| Title: List for Gigi<br>Summary: Log into Juliana Skype introduce herself<br>Source: Notes<br>Labels:<br>Body: List for Gigi<br><br>Log into Juliana Skype introduce herself<br><br>Get hippa and aks agreements empty for all the centers<br><br>Introduce to Tran get new crm empty in new website<br><br>Upload all unbilled patients in it with DOS<br><br>Make sure faxing works properly<br><br>Get all the other companies situated<br><br>Get script from call center<br><br>Get Pakistan person to help 9-5 when needed<br><br>Make sure the crm is faxing automatically<br><br>Reports for Kathy emailed daily at 6:00 eastern time<br><br>Total leads in<br>Total QA finished<br>Total DOs in<br>Total dr call per agent maybe add dispostion<br>Total denials<br><br>Same for weekly mon- Friday sent 6pm Friday<br><br>List verde capital and get website up listed for sale on companies for sale | Title: 1800-217-9100 4<br>Summary: Skype I used his Skype only for call centers, also Gianna dealt with them<br>Source: Notes<br>Labels:<br>Body: 1800-217-9100 4<br><br>Skype I used his Skype only for call centers, also Gianna dealt with them<br><br>Chase medical I bought that company a while ago<br><br>Jc did Montana medical for me and it was in the up and<br><br>Everything is legal<br><br>Safe harbour contracts<br><br>I wasn't paying for leads paying hourly for agents to verified opted in data<br><br>Your going to sell the company once accredited<br>Parties: |
| Note created 5/3/2020 | Note created 6/16/2020 |

Perez's disregard for the law governing the industry he chose to do business (and make tens of millions of dollars) in and lack of remorse was also clear from his personal communications. In late June, 2020, Perez wrote Kathleen two letters, one with instructions on how to liquidate their assets and the second with notes for their infant daughter. Ex. K, Emails from Perez to K. Perez. Of his guilty plea, he wrote,

> "Dont trust the goverment and just know money is not everything … I was forced to make a decision where it was either me going away or they were going to take your mom, Your mom was innocent yes I did some not so bright things but nothing was illegal the goverment made plea out or else they were taking your mom. Its not what the truth is what they want it to be."

*Id.* (errors in original).

## II.     SENTENCING CALCULATION

The government submits that the appropriate sentencing guideline calculation results in an offense level of 35, which results in a guideline sentence of 168-210 months. The government and defendant dispute four sentencing enhancements. The government submits that the amount of loss is approximately $35.5 million while the defendant claims that the loss amount is $12 million (*See* U.S.S.G. § 2B1.1(b)(1)(L)). Additionally, the government agrees with Probation's finding that the mass-marketing, federal health care program, and role in offense enhancements all apply (U.S.S.G. §§ 2B1.1(b)(2)(A)(ii); 2B1.1(b)(7)(iii); and 3B1.1, respectively).

Probation seeks several additional enhancements to arrive at a total offense level of 42, including sophisticated means (U.S.S.G. § 2B1.1(b)(10)(C)), obstruction of justice (U.S.S.G. § 3C1.1), and failure to accept responsibility (U.S.S.G. § 31.1). The government takes no position on these enhancements, in deference to the defendant's plea agreement.

### A.     Perez Caused a Loss Exceeding $25 Million (U.S.S.G. § 2B1.1(b)(1)(L))

The appropriate loss amount in this case is $35.5 million: the aggregate amount Perez's DME shell companies received from Medicare Advantage sponsors, minus payments that Perez returned at the sponsors' request. Ex. L, Total Payments Received from Medicare Advantage Sponsors. Perez does not provide credible evidence to rebut the government's calculations, nor can he explain his $12 million loss calculation. A sentencing court need only make a reasonable estimate of the loss based on the evidence. U.S.S.G. § 2.B1.1 n3(C). Moreover, in health care fraud cases involving a government health care program, "the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie

6

evidence of the amount of the intended loss, *i.e.*, is evidence sufficient to establish the amount of the intended loss, if not rebutted." U.S.S.G. § 2B1.1 n.3(F)(viii).[2]

Here, three independent bases support the fraud loss enhancement where a defendant has caused over $25 million in losses. First, Perez used patient referrals for all insurance claims, thus all $35.5 million received from Medicare Advantage sponsors violated the Anti-Kickback Statute. Second, DME is only eligible for Medicare reimbursement if the patient has a valid physician's order for the DME. Perez produced signed physicians' orders for only $505,000 in paid claims, which means at least $33.9 million in his claims lacked physicians' orders. Third, analysis of Perez's insurance claims reveals so many indicia of fraud that it is reasonable to estimate that all of the $35.5 million in payments were fraudulent.

### 1. $35.5 Million in Claims Payments Violated the Anti-Kickback Statute

All of Perez's claims originated from patient referrals that he bought from call centers in violation of the Anti-Kickback Statute. As a result, the loss amount is $35.5 million, the total Perez received from Medicare Advantage sponsors. Perez concedes that he used beneficiary information purchased from call centers to create his DME claims. *See* Pre-Sentence Report ¶¶ 12, 14, and 15. In addition, two of Perez's associates pleaded guilty to selling patient referrals to Perez. *United States v. Nathan LaParl* and *United States v. Talia Alexandre*, Case No. 20-cr-10223. Two other employees pleaded guilty to assisting Perez in buying patient referrals from

---

[2] The government's loss calculation is extremely conservative. The loss amount is the greater of actual or intended loss, thus the government could have argued that the intended loss amount was $109 million, the amount billed to Medicare Advantage sponsors. *See United States v. Iwuala*, 789 F.3d 1, 14 (1st Cir. 2015) ("In cases of health-care fraud, courts have regularly held that the amount billed to Medicare is prima facie evidence of intended loss.") (collecting cases).

call centers. *United States v. Jessica Jones* and *United States v. Elizabeth Putulin*, Case No. 20-cr-10212.

In contesting the loss amount, Perez advances two arguments that are factually and legally baseless and inconsistent with his guilty plea in this case. First, Perez claims that the patient leads purchased from call centers are not "patient referrals." Ex. A, Perez Objections to the PSR at ¶¶ 12, 14, and 15 ("These paragraphs incorrectly refer to sales leads as 'patient referrals.' They were not referrals. A flat, predetermined fee was paid for these sales leads.") Second, Perez argues that the Medicare Advantage claims submitted by Perez are not Medicare claims and thus the Medicare Advantage payments were not made "under a Federal health care program." Ex. A, Perez Objections to the PSR at ¶¶ 9, 10, 12, 14, 15, 16, 20, 21, 29, 26.

Both arguments seem to contradict his admission that he violated the Anti-Kickback Statute, which includes the elements of: (a) making a payment in exchange for a referral of a patient and (b) the patient's services were covered, in whole or in part, by a Federal health care program, such as Medicare. 42 U.S.C. § 1320a-7b. It is not clear how Perez can argue that he did not buy patient referrals and did not make claims that were covered by a Federal health care program such as Medicare when he has pleaded guilty to doing just that in violation of the Anti-Kickback Statute. His plea should end the inquiry.

As a factual matter, the patient information that Perez purchased from call centers are patient referrals under the plain text of the Anti-Kickback Statute: Perez made payments to call centers "to refer an individual to a person for furnishing … of any item for which payment may be made … under a Federal health care program." 42 U.S.C. § 1320a-7b. Perez paid call centers a fixed fee (*e.g.*, $17-$85) for patient information including the patient's date of birth, address, insurance policy number, etc. and used that information to submit claims for DME to Medicare

Advantage sponsors.  Courts regularly find that purchasing patient information are referrals under the Anti-Kickback Statute.  In *United States v. Ogba*, for example, the defendants were convicted of buying referrals from recruiters who found patients who may be interested in wheelchairs.  526 F.3d 214, 220 (5th Cir. 2008).  *See also United States v. Med-Care Diabetic & Med. Supplies, Inc.*, No. 1081634CIVRYSKAMPHOP, 2014 WL 12279512, at *4 (S.D. Fla. Dec. 23, 2014); *United States v. Turner*, 561 F. App'x 312, 320 (5th Cir. 2014).  The Department of Health and Human Services Office of the Inspector General explicitly forbids providers from paying a flat rate for patient leads—as Perez did—because they amount to patient referrals in violation of the Anti-Kickback Statute.  *See* HHS-OIG Advisory Opinion 08-19, issued 10/29/2008, available at https://oig.hhs.gov/fraud/docs/advisoryopinions/2008/AdvOpn08-19.pdf.

Nor is there any doubt that Medicare Advantage payments are payments "made in whole or in part under a Federal health care program," because they are partially funded by the Centers for Medicare and Medicaid Services ("CMS").  42 U.S.C. § 1320a-7b.  Enacted in 1965, Medicare is a federally run health insurance program benefitting primarily those who are 65 years of age and older.  Medicare Parts A and B—also known as Original Medicare—are fee-for-service insurance programs operated by the federal government.  42 U.S.C. § 1395c *et seq.* (Part A); 42 U.S.C. § 1395j *et seq.* (Part B).  In 1997, Congress enacted Medicare Part C—also known as Medicare Advantage—to allow Medicare beneficiaries to opt out of traditional fee-for-service coverage under Original Medicare. 42 U.S.C. § 1395w–21 *et seq*.  Medicare Advantage allows private insurers (or Medicare Advantage sponsors) to contract with CMS to offer Medicare beneficiaries medical coverage similar to Original Medicare.  *Cares Cmty. Health v. United States Dep't of Health & Hum. Servs.*, 944 F.3d 950, 953 (D.C. Cir. 2019).  CMS pays Medicare

Advantage sponsors a fixed amount for each eligible Medicare beneficiary they enroll, and the sponsors in turn negotiate agreements with healthcare providers to reimburse them for services they provide to the sponsors' enrolled beneficiaries. *Id*. Thus, payments made by Medicare Advantage sponsors are "payment … in whole or in part under a Federal health care program" because they are partially funded by CMS. 42 U.S.C. § 1320a-7b.

In addition, federal regulations explicitly state that the Anti-Kickback Statute applies to Medicare Advantage sponsors. 42 CFR § 422.504(h)(1) ("The [Medicare Advantage] organization agrees to comply with … the anti-kickback statute (section 1128B(b)) of the Act."). Moreover, DME providers who submitted Medicare Advantage claims have routinely been prosecuted under the Anti-Kickback Statute. *See, e.g.*, *United States v. Sosa*, 777 F.3d 1279, 1291 (11th Cir. 2015); *United States v. Scott Navani*, Criminal No. 19-80176 (S.D. Fl.); *United States v. Leah Hagen*, Criminal No. 19-146 (N.D. Tex.). In *Sosa*, for example, the defendant invested in a community clinic that paid a patient recruiter to and then billed Medicare Advantage sponsors for expensive drug doses. *Id*. at 1287. The Eleventh Circuit found that there was ample evidence to support the Anti-Kickback Statute conviction and did not even entertain an argument that Medicare Advantage payments are not funded by a Federal health care program. *Id*. at 1291.

    **2.**    **Perez Received $34.9 Million in Claims That Lacked Physicians' Orders**

The loss amount also exceeds $25 million because Perez received about $34.9 million in insurance payments for DME for which he lacked valid physicians' orders.

DME is only eligible for Medicare reimbursement if the patient has a valid physician's order ensuring the DME is medically necessary. The Medicare Program Integrity Manual states, "All [DME] items require a written order/prescription from the treating practitioner for Medicare

payment as a condition of payment." Ex. M, Medicare Program Integrity Manual, Ch. 5.2. The Medicare Claims Processing Manual states that orthotics such as leg, arm, back, and neck braces "are covered under Part B as a medical or other health service … when furnished incident to physicians' services or on a physician's order." Ex. N, Medicare Claims Processing Manual, Ch. 20 at Rule 10.1.3. The Medicare Benefit Policy Manual similarly states that leg, arm, back, and neck braces, "are covered under Part B when furnished incident to physicians' services or on a physician's order." Ex. O, Medicare Benefit Policy Manual, Ch. 15 at 140.

The Medicare requirements for DME apply with equal force to Medicare Advantage plans. For example, UnitedHealthcare's Medicare Advantage Coverage Summary for DME states, DME "are covered when Medicare coverage criteria are met." Ex. P, UnitedHealthcare Coverage Summary at Sec. I. It further states that orthotics must be "furnished on a physician's order." *Id.* at Sec. I, n. 2(b).

Only about $505,000 of Perez's claim payments were supported by physician's orders—this is less than 1.5% of Perez's paid claims, and less than 0.5% of the billed claims. During the investigation, Perez's companies produced faxes received from physicians' offices in response to prescription requests. Of the 2,874 physician's orders that were faxed back to Perez's companies, less than 1,200 were signed, and those signed physicians' orders accounted for about $600,000 in claim payments. Thus, Perez received $34.9 million in payments for DME that were not supported by a physician's order. Incidentally, Perez received more than 1,500 faxes that physicians refused to sign—many physicians offices wrote "X," "NO," or "This is fraud" on the request. Ex. Q, Refused Physicians Orders.

Perez also argues that the DME provided to beneficiaries by Perez's companies were over-the-counter braces, which do not require prescriptions or determinations of medical

11

necessity. Ex. A at ¶¶ 10, 20. But Perez's claims listed Healthcare Common Procedure Coding System ("HCPCS") codes for DME that are not over-the-counter but require physicians' orders, as shown in Table 1 below. Ex. C. For example, the two most lucrative braces codes (L1832 and L0631) both require customization by a trained individual. HCPCS Code L1832 covers knee orthosis with adjustable knee joints that has been "trimmed, bent, molded, assembled, or otherwise customized to fit a specific patient by an individual with expertise." HCPCS Code L0631 covers lumbar-sacral orthosis that has been "trimmed, bent, molded, assembled, or otherwise customized to fit a specific patient by an individual with expertise."

| Table 1: HCPCS Codes Submitted by Perez (Jan. 2013 – Apr. 2019) | | | | |
|---|---|---|---|---|
| **HCPCS Code** | **Short Description** | **Amount Billed** | **Amount Paid** | **# Paid DME** |
| **L1832** | Knee orthosis | $32,111,126.57 | $7,142,944.81 | 15,897 |
| **E0691** | Ultraviolet light therapy system | $20,567,395.62 | $6,475,932.30 | 11,125 |
| **L0631** | Lumbar-sacral orthosis | $17,621,546.92 | $7,720,220.86 | 11,735 |
| **L3960** | Shoulder elbow wrist hand orthosis | $14,166,637.19 | $4,064,597.85 | 8,230 |
| **L1971** | Ankle foot orthosis | $8,451,405.55 | $1,854,872.56 | 5,848 |
| **E0692** | Ultraviolet light therapy system panel | $6,050,467.65 | $1,439,421.03 | 3,199 |
| **L0650** | Lumbar-sacral orthosis | $4,696,471.21 | $1,812,766.86 | 2,612 |
| **L3916** | Wrist hand orthosis | $2,534,808.00 | $416,216.90 | 1,259 |
| **L3807** | Wrist hand finger orthosis | $2,072,155.75 | $243,779.20 | 1,556 |

### 3. Claims Analysis Shows That $35.5 Million is a Reasonable Loss Estimate

Perez's claims are facially fraudulent based on the government's claim analysis. Comparing the claims Perez submitted to Medicare Advantage sponsors to CMS's patient

information revealed many irregularities that are indicative of fraud.  Ex. C, HHS Division of Data Analytics Claims Analysis.

- Perez submitted over 1,000 claims for supplies and services provided after the beneficiary died.  Ex. R, Claims Submitted for Dead Beneficiaries.  Most of the claims were made months—if not years—after the beneficiaries' death.  120 of these claims were paid.  Ex. C.

- Less than 30% of Perez's claims listed a provider with whom the beneficiary had a preexisting relationship.  Ex. C at 5.  Of those claims, the prescriber last saw the patient an average of 567 days before Perez's claimed date of service.  Many claims listed referring providers that did not refer any patients to Perez's company.  Prescribers Dr. Marie Debnam, Dr. Sachida Manocha, were listed on claims for over $1,590,000 in paid claims.  Each of those doctors stated that they rarely prescribed DME and did not recognize the name of Perez's companies.  Ex. S, Interviews with Drs. Debnam, Manocha, and Patel.

- Perez regularly re-submitted claims, both paid and unpaid.  He submitted claims for about 35,000 beneficiaries, and on average each patient was billed for 3.7 pieces DME.  Ex. C.  Over half of the beneficiaries were billed for more than one type of brace.  *Id.*  For over 9,000 beneficiaries, Perez was paid for multiple types of braces.

- Perez received $6.5 million in payments for ultraviolet light therapy systems between January 2013 - April 2019.  But during that time, he did not buy a single light therapy system for any patient.  Ex. T, Report of Perez's Proffer of February 2020.

- More than 48% of the total claims submitted by Perez were denied outright by Medicare Advantage sponsors.

Given this analysis, it is reasonable to conclude that all of Perez's $35.5 million paid claims were fraudulent.

###    B.   Perez's Offense Involved Mass-Marketing (U.S.S.G. § 2B1.1(b)(2)(A)(ii))

Perez's DME scheme was committed using mass marketing—that is, call centers that called hundreds of patients a week to offer DME products.  The Sentencing Guidelines define "mass marketing" to include a "campaign that is conducted through solicitation by telephone … to induce a large number of persons to [] purchase goods or services…"  The enhancement has been consistently applied in similar DME cases where the defendant solicited patients promising free DME.  *United States v. Isiwele*, 635 F.3d 196, 198 (5th Cir. 2011) (defendant instructed

recruiter to go into elderly and low-income communities and gather billing information from Medicare/Medicaid patients); *United States v. Mauskar*, 557 F.3d 219, 233 (5th Cir. 2009) (defendant fraudulently prescribed wheelchairs for over a thousand elderly ambulatory Medicare patients who were promised free wheelchairs).

    **C.    Perez Was Convicted of a Federal Health Care Offense and Loss to the Government Health Care Program Was More Than $20 million (U.S.S.G. § 2B1.1(b)(7)(iii))**

As discussed above, the Medicare Advantage claims submitted by Perez caused a loss involving a government health care program of more than $20,000,000.

    **D.    Perez Was the Leader of a Criminal Scheme Involving More Than Five Participants (U.S.S.G. § 3B1.1)**

Perez was the mastermind of the scheme and he employed, directed, and partnered with about a dozen people to carry out it out. *See e.g., United States v. Perez*, 285 F. App'x 706, 709 (11th Cir. 2008) (four-point enhancement was appropriate because defendant was integral to DME scheme even though her co-conspirators were also leaders); *United States v. Nowlin*, 640 F. App'x 337, 349 (5th Cir. 2016) (enhancement applied to owner of DME company even though other employees were not criminally culpable). Five other participants have pleaded guilty to related charges. *United States v. Nathan LaParl, Talia Alexandre, and Stefanie Hirsch,* Case No. 20-cr-10223; *United States v. Jessica Jones and Elizabeth Putulin*, Case No. 20-cr-10212. Other uncharged employees include Stephanie Raterman, Elisha Kite, Rebecca East, Heather Jeffries, Alexis Savant, Rebecca Bruno, Paul Bruno, Juliana Desantis, and Gianna Rowe. Perez even created an organizational chart, shown below, which shows himself ("JC") at the top directing six other employees including Elizabeth Putulin ("Liz") and Talia Alexandre ("Talia").



### III. THE RECOMMENDED SENTENCE IS CONSISTENT WITH SIMILAR OFFENSES

Section 3553(a) of Title 18 specifies the factors courts are to consider in imposing a sentence and instructs courts to "impose a sentence sufficient, but not greater than necessary, to comply with" the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation. 18 U.S.C. § 3553(a). Section 3553(a) then directs a sentencing court to take into account "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as "the need for the sentence imposed" to serve the four overarching aims of sentencing. §§ 3553(a)(1), (2)(A)–(D); *see Gall v. United States*, 552 U.S. 38, 50, n. 6 (2007). The court must also consider the pertinent guidelines and policies adopted by the Sentencing Commission. §§ 3553(a)(4), (5); *see id.*, at 50, n. 6. Each of these factors supports the recommended sentence.

The 15-year sentence is just punishment for Perez's crime and will provide general deterrence for similar health care fraud schemes. Perez's $35.5 million scheme was the most lucrative DME fraud prosecuted in this district, and one of the largest DME schemes nationwide. This was an expansive scheme that ranged over seven years, involving approximately a dozen employees and 35,000 Medicare beneficiaries. Moreover, DME fraud is a rampant and incorrigible crime. The recommended sentence reflects the scale and seriousness of the offense and discourages future offenders.

The lengthy sentence is also necessary for specific deterrence. The underlying DME fraud was not a crime of necessity, a youthful folly, or a legitimate business that was later corrupted. Perez engineered a wholly fraudulent enterprise fueled by greed and hubris. Perez defrauded the government and exploited the personal information of thousands of unsuspecting seniors to fund his lavish lifestyle complete with yachts, Lamborghinis, McLarens, amateur race cars, and luxury houses. Perez's conduct is compounded by his recent behavior: trying to continue his DME scheme under his wife's name, lying to law enforcement, and making unsupported factual contentions and legal arguments at sentencing. Perez is trying to have it both ways—he wants to keep the benefit of his plea agreement and guilty plea but refuses to bear its full ramifications. The Court's sentence should promote respect for the law and, by the same token, it should punish Perez's disregard for the law.

## IV.    CONCLUSION

For the foregoing reasons, the Government submits that the Court should sentence the defendant, Juan Camilo Perez Buitrago, to a term of incarceration of 180 months, order restitution in the amount of $35,590, 245, and grant the government's motion for an order of forfeiture (money judgment).

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By: /s/ *Elysa Q. Wan*
Elysa Q. Wan
Carol E. Head
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                         */s/ Elysa Q. Wan*
                                         Elysa Q. Wan
                                         Assistant United States Attorney

Date: May 3, 2021